

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| vs. § | Criminal Action No.: 3:24-615-MGL-1 |
| § | |
| DAVANTE JAMAR MOORE, § | |
| Defendant. § | |

**MEMORANDUM OPINION AND ORDER
DENYING DEFENDANT'S MOTION TO SUPPRESS**

## I.     INTRODUCTION

Pending before the Court is Defendant Davante Jamar Moore's (Moore) motion to suppress evidence seized as the result of a narcotics-detection dog's free-air sniff of his vehicle. Having carefully considered the motion, the response, the oral arguments, the record, and the applicable law, it is the judgment of the Court Moore's motion will be denied.

## II.    FACTUAL AND PROCEDURAL HISTORY

The Court determines the following facts by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

Shortly before 9:40 p.m. on March 29, 2024, Corporal Thomas Johnson (the K9 Officer) with the Columbia Police Department witnessed a vehicle with an inoperable headlight turn away

from his direction. The K9 Officer thus radioed other officers on patrol in the area to keep an eye out for the vehicle.

At 9:40 p.m., Lance Corporal Richard Johnson (the Traffic Officer) initiated a traffic stop on a vehicle, which was driven by Moore, matching the K9 Officer's description. Moore provided the Traffic Officer his driver's license, registration, and proof of insurance, and the Traffic Officer asked for Moore's consent to search the vehicle. Moore declined, so the Traffic Officer returned to his patrol car to begin processing Moore's information through the National Crime Information Center (NCIC) and Department of Motor Vehicles (DMV) databases and drafting a warning ticket.

At 9:42 p.m., the K9 Officer arrived on scene with his narcotics-detection dog, K9 Rocket. Within minutes, the Traffic Officer paused writing the warning ticket and asked Moore to step out of his vehicle so K9 Rocket could conduct a free-air sniff. As Moore exited his vehicle, the K9 Officer explained the process of a free-air sniff.

At 9:45 p.m., the Traffic Officer returned to his patrol car and resumed composing the warning ticket. Meanwhile, the K9 Officer retrieved K9 Rocket from his own patrol car.

Between 9:46 p.m. and 9:48 p.m., K9 Rocket paced two-and-a-half laps around Moore's vehicle. During the sniff, K9 Rocket pressed his nose against the rear passenger-side door and on the seam between the front and rear driver-side doors. K9 Rocket also briefly placed his snout inside the front driver-side window, which was open, and proceeded to sit beside the rear driver-side door. The K9 Officer recognized all these behaviors as consistent with a positive alert for narcotics.

At 9:48 p.m., shortly after K9 Rocket rendered his response, the Traffic Officer finalized and printed Moore's warning ticket. The K9 Officer then informed Moore his vehicle would be

searched, as K9 Rocket had alerted. The search revealed, as is relevant here, cocaine and a pistol in the rear passenger area.

Based on the foregoing, a federal grand jury indicted Moore for felon in possession of a firearm, possession with intent to distribute cocaine, and possession of a firearm during and in furtherance of a drug trafficking crime.

Moore filed this motion to suppress, and the government responded. The Court held a hearing, during which the Traffic Officer and the K9 Officer testified, and then took the matter under advisement. Having been fully briefed on the relevant issues, the Court will now adjudicate the motion.

### III.     STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "An automobile stop, therefore, is subject to the reasonableness requirement of the Fourth Amendment." *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018).

Because a routine traffic stop is "more analogous to an investigative detention than a custodial arrest," the Court applies the two-prong test from *Terry v. Ohio*, 392 U.S. 1 (1968), in analyzing the constitutional adequacy of a traffic stop. *United States v. Green*, 740 F.3d 275, 279 (4th Cir. 2014) (citing *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992)). Under this

3

test, the Court "consider[s] (1) whether the officer's actions were justified at their inception and (2) whether his subsequent actions were reasonably related in the scope of circumstances that justified the stop." *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019) (citing *Terry*, 392 U.S. at 20).

## IV.   DISCUSSION AND ANALYSIS

Even assuming Moore's headlight was inoperable in violation of S.C. Code Ann. § 56-5-4820, Moore argues "this statute only provides that anyone who violates [it] is subjected to a fine of twenty-five dollars. Therefore, absent any articulable suspicion, [the Traffic Officer] should have only issued a citation ending the stop." Motion to Suppress at 6. The Court disagrees.

Footage from the K9 Officer's body-worn camera shows one of Moore's headlights was unilluminated during the stop. This is indisputably a violation of South Carolina law. *See* S.C. Code Ann. § 56-5-4820 (stating, thirty minutes after sunset, "at least two lighted lamps shall be displayed, one on each side at the front of every motor vehicle . . . except when such vehicle is parked"). The Traffic Officer thus had probable cause to believe a traffic violation had occurred, and his initial stop was reasonable. *See Whren*, 517 U.S. at 810 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

As the Fourth Circuit has explained, "[w]hile diligently pursuing the purpose of a traffic stop, officers also may engage in other investigative techniques unrelated to the underlying traffic infraction or the safety of the officers." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (citing *United States v. Rodriguez*, 575 U.S. 348, 355 (2015)). Such techniques include using a trained narcotics-detection dog, like K9 Rocket, to conduct a free-air sniff of the vehicle. *United*

*States v. Howell*, 71 F.4th 195, 202 (4th Cir. 2023) (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)). Accordingly, the Court is unconvinced the free-air sniff required any additional suspicion as Moore implies.

Moore also asserts the Traffic Officer unconstitutionally prolonged the stop. Moore notes he declined the Traffic Officer's request to search the vehicle, and he insists the Traffic Officer "lack[ed] articula[]ble reasonable suspicion to investigate further with the K9 Unit." Motion to Suppress at 7. Again, the Court is unpersuaded.

The Fourth Circuit has advised "the reasonable duration of a traffic stop 'cannot be stated with mathematical precision.'" *United States v. Vaughn*, 700 F.3d 705, 709 (4th Cir. 2012) (quoting *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008)). Nevertheless, "a stop may become 'unlawful if it is prolonged beyond the time reasonably required to complete its mission.'" *Id.* (quoting *Caballes*, 543 U.S. at 407).

Here, however, neither the Traffic Officer's request for consent to search Moore's vehicle nor his consultation with the K9 Officer constitute such delays.

As the Court noted above, the Traffic Officer initiated the stop at approximately 9:40 p.m. Within two minutes, the Traffic Officer was processing Moore's demographic information through the NCIC and DMV databases. At 9:44 p.m., the Traffic Officer began drafting the warning ticket. Though the Traffic Officer briefly paused to request Moore step out of his vehicle, he immediately returned to his patrol car to continue writing the ticket. And, when the Traffic Officer printed the ticket at 9:48 p.m., K9 Rocket had already rendered a positive alert.

The record makes clear, throughout the entire stop, the Traffic Officer was either speaking to Moore, verifying his information, or preparing a citation. All of these actions are incidental to a routine traffic stop and thus lawfully within its scope. *See Rodriguez*, 575 U.S. at 355 ("Beyond

5

determining whether to issue a traffic ticket, an officer's mission [during a traffic stop] includes 'ordinary inquiries incident to [the] stop.' Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (quoting *Caballes*, 543 U.S. at 408)).

Although Moore posits the Traffic Officer had sufficient time to generate a warning ticket by 9:44 p.m. when the Traffic Officer asked him to step out of the vehicle, the Traffic Officer testified he was only halfway through drafting the citation at this juncture. Indeed, the Traffic Officer printed the warning ticket seconds after K9 Rocket completed the free-air sniff.

For all these reasons, the Court rejects Moore's argument the stop was unconstitutionally prolonged.

Finally, Moore avers there is insufficient evidence K9 Rocket's training was reliable or that he positively alerted to narcotics. The Court, again, is unpersuaded.

The South Carolina Police K9 Association (the Association) certified the K9 Officer and K9 Rocket as a patrol canine team on March 9, 2023. According to the Association's Guidelines for Patrol Canine Team Certification, which Moore presented at the hearing, and the K9 Officer's testimony, a certification from the Association is valid for twelve months with a three-month grace period for patrol dogs. And, the Association recertified the K9 Officer and K9 Rocket on April 30, 2024, which is within this grace period.

In light of K9 Rocket's certification, the Court determines his alert was inherently reliable. *See, e.g.*, *Florida v. Harris*, 568 U.S. 237, 246–47 (2013) ("[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert

6

provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs."); *see also, e.g.*, *United States v. Eymann*, 962 F.3d 273, 289 (7th Cir. 2020) (stating a narcotics-detection dog's lack of certification is inconclusive for Fourth Amendment purposes where it was due to administrative error, rather than incompetence).

As the Court noted above, Moore maintains there is insufficient evidence K9 Rocket positively alerted to narcotics in his vehicle. But, the K9 Officer stated K9 Rocket issues both a primary and final response when he detects narcotics in a particular area. His primary response is physical—such as an abrupt directional change, a sudden head jerk, or pressing his nose on a surface—and his final response is to either sit or lock his position.

Here, the K9 Officer testified K9 Rocket was chasing the odor of narcotics in Moore's vehicle during the free-air sniff. Indeed, on his second lap around the vehicle, K9 Rocket pressed his nose against the seam of the rear passenger-side door, which is where the cocaine was later discovered. K9 Rocket also pressed his nose on the seam between the front and rear driver-side doors, following the seam up to the front driver-side window and momentarily poking his snout inside. K9 Rocket then returned to the K9 Officer and locked his position. The Court finds these behaviors collectively indicate K9 Rocket positively alerted to narcotics in Moore's vehicle.

At the hearing, Moore cited *United States v. Corbett*, 718 F. Supp. 3d 537 (S.D.W. Va.), and *United States v. Handley*, 564 F. Supp. 2d 996, (S.D. Iowa), in support of his proposition K9 Rocket trespassed when he inserted his head into the open driver-side window. But, *Corbett* and *Handley* are merely persuasive. And, in any event, the purported trespass occurred without the K9 Officer's prompting and after K9 Rocket issued his primary response.

For all these reasons, the Court holds the Traffic Officer and K9 Officer had probable cause to search the vehicle based on K9 Rocket's alert. *See Branch*, 537 F.3d at 341 n.2 ("[A] positive alert from a drug detection dog, in and of itself, provides probable cause to search a vehicle." (internal quotation marks omitted)).

Finally, though Moore argued in the motion his custodial statements should be suppressed, he abandoned this argument at the hearing, so the Court need not address it.

## V.     CONCLUSION

Wherefore, based on the foregoing discussion and analysis, it is the judgment of the Court Moore's motion to suppress, ECF No. 43, is **DENIED**.

**IT IS SO ORDERED.**

Signed this 29th day of September 2025, in Columbia, South Carolina.

s/ Mary Geiger Lewis  
MARY GEIGER LEWIS  
UNITED STATES DISTRICT JUDGE